**Eric MADRY, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 14–05–00104–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

July 25, 2006.

---

Peter Adams, Houston, for Appellant.

Kevin P. Keating, Houston, for State.

Panel consists of Justices ANDERSON, EDELMAN, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

Appealing his aggravated assault conviction, appellant Eric Madry asserts the trial court reversibly erred in denying his request to call a witness to impeach the complainant and in limiting his punishment-phase closing argument to five minutes. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant and the complainant, Demetria Jackson, are the parents of a school-age daughter and were involved in an "on again, off again" relationship. On Valentine's Day 2004, appellant shot Jackson in the mouth. The bullet traveled through Jackson's lip, almost cut her tongue in half, and fractured the first cervical vertebrae in her neck. Appellant was charged with aggravated assault. At his trial, the only disputed issue was whether the shooting was accidental or intentional.

Jackson testified that appellant intentionally shot her at a very close range. She recounted the events that led to the shooting, explaining that on the night of the incident, she picked appellant up from her sister's house on her way home from work. According to Jackson, she and appellant were trying to reconcile. After they arrived home around 11:30 p.m., Jackson took a bath and went to her bedroom to watch television. Around 1:30 a.m., as she was drifting off to sleep, she noticed appellant reclining in a chair next to her bed. When she awoke an hour later, appellant was not there, prompting her to get out of bed to investigate his whereabouts.

Jackson soon discovered that her vehicle was missing. As she walked back to her bedroom, she heard the garage door open. When she saw appellant, she asked him where he had gone. In response, appel-

lant accused her of being with another man earlier that day and pushed her onto the bed. Appellant pinned her down and pulled her hair when she attempted to escape. According to Jackson, appellant then jumped up, and said, *"I'm going to show you I'm going to show you."* Appellant left and returned seconds later with her handgun and pinned her down again, saying, *"I'm tired of you. I'm tired of you Demetria."* Appellant pushed the handgun into Jackson's cheek. Initially, Jackson did not believe appellant would shoot her, however, his demeanor changed during the struggle. Appellant placed his arm around her neck, dragged her off the bed, and told her that she was going to die. Appellant then shot her in the mouth.

Immediately after the shooting, appellant began screaming, *"Oh God, oh Lord, oh s——."* He ran around the house, as Jackson felt like she was "drifting away." Upon her repeated requests, appellant finally placed a 9–1–1 call and stated, "my girlfriend has been shot." Jackson took the phone away from appellant and tried to explain what had happened, but she experienced great difficulty in doing so because she had just been shot in the mouth. The police arrived while Jackson was still on the phone with the 9–1–1 operator.

Deputy Abraham Alanis with the Harris County Sheriff's Department was the first officer to arrive on the scene. When he arrived, appellant stood at the front door appearing quite "hysterical." Appellant claimed that he accidently shot his girlfriend. Deputy Alanis found Jackson on the floor, bleeding severely from her mouth. Deputy Alanis testified that he thought that Jackson stated the shooting was accidental, but because the gunshot injury was affecting her speech, it was difficult to discern what she actually said. Deputy Alanis tried to ask her further

questions about the shooting, but Jackson could not answer.

Appellant, testifying in his own defense, gave a very different account of what happened that night. He testified that after Jackson fell asleep, he left the house for a short period. When he returned, Jackson questioned him about where he had been and then "got in his way" as he tried to put a load of clothes into the washing machine. After becoming very irritated, he pushed her out of the way and they exchanged words. Appellant told Jackson that he easily could leave because he had another woman waiting for him. According to appellant, after he made this statement, Jackson stormed out of the room. Realizing it was Valentine's Day, appellant followed Jackson into the bedroom to reconcile. When he entered the bedroom, Jackson had a gun in her hand. Appellant stated that he grabbed at the gun to take it away and it accidently went off in Jackson's mouth. Appellant testified that he immediately placed the 9–1–1 call. However, during cross-examination, appellant changed his account, explaining that he was trying to show Jackson that the gun was not loaded when it accidently discharged. He further said he might have told the police that when he pulled the slide back to show her that the gun was not loaded, his finger could have been on the trigger causing it to accidently discharge.

The jury convicted appellant of the charged offense and assessed punishment at twelve years' confinement.

## II. Issues Presented

Appellant asserts the following two issues on appeal:

(1) The trial court abused its discretion in denying his request to call a witness to impeach the complainant with a prior inconsistent statement.

(2) The trial court reversibly erred in limiting closing argument to five minutes during the punishment phase.

## II. ANALYSIS

### A. Did the trial court abuse its discretion in denying appellant's request to call a witness to impeach the complainant based on an alleged prior inconsistent statement?

■ In his first issue, appellant contends that the trial court abused its discretion in denying his request to call a witness to impeach Jackson with a prior inconsistent statement. We conclude that appellant failed to lay the proper predicate for the introduction of any prior inconsistent statement made by Jackson.

■ We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Rankin v. State,* 974 S.W.2d 707, 718 (Tex.Crim.App.1996) (op. on reh'g). In determining whether the trial court abused its discretion, we consider whether the court acted without reference to guiding rules and principles—that is, whether the court acted arbitrarily or unreasonably. *Lyles v. State,* 850 S.W.2d 497, 502 (Tex.Crim.App.1993). We must uphold the trial court's ruling so long as it is "within the zone of reasonable disagreement." *Wheeler v. State,* 67 S.W.3d 879, 888 (Tex.Crim.App.2002).

■ A party may impeach a witness with evidence of a prior inconsistent statement if the party first presents the witness with the existence of the statement, the details and circumstances surrounding the statement, and gives the witness the opportunity to explain or deny the statement. TEX.R. EVID. 613(a). To be admissible under Texas Rule of Evidence 613(a), a prior statement must be inconsistent with the one given at trial. *Lopez v. State,* 86 S.W.3d 228, 230 (Tex.Crim.App.2002). If a party fails to establish this predicate, the trial court should sustain an objection to extrinsic proof of the prior inconsistent statement. *Ferguson v. State,* 97 S.W.3d 293, 296 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd).

Appellant complains that the trial court abused its discretion when it refused to permit him to call a witness to impeach Jackson with a prior inconsistent statement. He further states that, although Jackson testified that appellant shot her intentionally, the trial court prevented him from eliciting evidence from another witness to show that Jackson previously said the shooting was accidental. Deputy Alanis testified as follows:

> **The State:** And were you able to communicate with the complainant?
>
> **Deputy Alanis:** Yes. Well, no. After when I went to the bedroom and I was escorting the defendant she did advise that it was an accident. [sic]. At least I believe that's what she said. It was hard to understand what she was saying. After I escorted the defendant to my unit I came back and tried to ask her other questions, but she didn't give any other answers. She was having trouble speaking.
>
> **The State:** Where was he when she said that?
>
> **Deputy Alanis:** In the bedroom. Still in the bedroom.

Although there is nothing in the record that suggests Jackson made the same or a similar comment to any person other than Deputy Alanis, appellant sought to call Michelle Permenter, a Crime Victims Advocate, as a witness who allegedly would have testified that Jackson told her that the shooting was accidental. The trial court denied appellant's request.

Under Rule 613, before appellant could introduce any extrinsic evidence that Jackson made a prior inconsistent statement to Permenter, he had to confront Jackson with the statement, telling her the contents of the statement and the time, place, and person to whom it allegedly was made. *Beauchamp v. State,* 870 S.W.2d 649, 652 (Tex.App.-El Paso 1994, writ ref'd) (holding that defendant failed to lay proper predicate for introduction of police officer's prior inconsistent statement indicating that he did not believe defendant was intoxicated). At trial, appellant asked Jackson only one question about her statement regarding whether the shooting was accidental or intentional. During her testimony, appellant asked Jackson, "You did tell the officers it was an accident, right?" Jackson replied, "I don't remember saying that." Appellant did not comply with Rule 613 as he did not confront Jackson with a prior inconsistent statement, nor did he summarize the contents of any prior inconsistent statements that she allegedly made to Permenter that would have been admissible under Rule 613. *See Carty v. State,* No. 74,295, 2004 WL 3093229, at *4 (Tex. Crim.App. Apr.7, 2004) (not designated for publication) (concluding that proper predicate for impeachment by prior inconsistent statement was not laid, so as to allow admission of alleged accomplice witnesses' prior inconsistent videotaped statements at capital murder trial, where those witnesses did not deny any statement actually made on the tapes); *Osteen v. State,* 61 S.W.3d 90, 91 (Tex.App.-Waco 2001, no pet.) (holding that defendant failed to lay the proper predicate for the admission of a prior inconsistent statement, where defendant did not tell victim the contents of the allegedly inconsistent statement or afford her an opportunity to explain or deny the statements); *L.M.W. v. State,* 891 S.W.2d 754, 759–60 (Tex.App.-Fort Worth 1994, writ ref'd) (holding that defendant charged

with indecency with a child by contact failed to lay proper predicate for videotaped evidence of child victim conducted by psychologist which contained exculpatory and impeaching evidence that directly contradicted victim's trial testimony, where defendant did not tell victim context of allegedly inconsistent statements or afford him opportunity to explain or deny statements). We conclude that the trial court did not abuse its discretion in refusing appellant's request to call Permenter as a witness. *Wheeler,* 67 S.W.3d at 888–89. Accordingly, we overrule appellant's first issue.

**B. Did the trial court err in limiting closing argument to five minutes during the punishment phase?**

■ In his second issue, appellant asserts the trial court erred in limiting closing argument to five minutes during the punishment phase of trial. We conclude that appellant failed to preserve error as to this issue.

During the punishment phase, appellant was not eligible for probation and the jury had to assess punishment based on a range of two to twenty years' confinement. The trial court formally readmitted into evidence all of the evidence that had been admitted during the guilt-innocence phase, although the jury did not hear this evidence a second time. The trial court admitted a stipulation of evidence as to appellant's prior convictions for assault and unlawfully carrying a weapon, as well as the judgments for those convictions. Appellant offered no evidence during the punishment phase of trial, although appellant's counsel had appellant's mother stand and he introduced her to the jury without calling her as a witness.

After the trial court informed appellant and the State that they would have five minutes each for closing argument, appel-

lant requested ten minutes instead of five. The trial court denied his request. Counsel for appellant stated on the record that he needed to make an informal bill of exceptions as to what his argument would have been if he had been granted ten minutes. The record contains the following exchange:

**The Court:** Both sides have five minutes to make final arguments.

Let's bring in the jury.

**Defense counsel:** I'd like ten.

**The Court:** Give you five.

**Defense counsel:** And make my Bill.

**The Court:** You'll get five minutes. Do the best you can.

**Defense counsel:** May I make my Bill on that later to the Court.

**The Court:** No need to make a Bill on the Judge's ruling.

**Defense counsel:** Yes, there is, Your Honor.

**The Court:** Not in regards to how much time you're going to get to argue.

**Defense counsel:** To show what I would argue. I'm going to keep it within five minutes. I'm—I'm objecting really to being so severely limited to five minutes.

**The Court:** Your objection is noted. It will be overruled.

**Defense counsel:** Motion for New Trial and further develop this issue.

After the State waived its right to open, appellant's counsel used his five minutes to make the following argument:

Thank you, Your Honor. We're here to ask you at this time to consider punishment. You will be instructed and have been instructed to do that. I'd like to mention a few factors that you may take into account. First of all, we certainly admit this is a bad case. Ms. Jackson was shot through the mouth and the bullet is still in her head. And it's a bad case. Lot of harm, lot of pain. So we don't dispute that. But now is the time for you to inflict pain on the defendant. Whatever pain you think he deserves. Justice calls for.

Now obviously, this is tough on a jury because for various reasons we—there is a lot more—this thing could have gone into next week. I always look back and say maybe I should have done more. Maybe I should have put Ms. Jackson under more cross examination. Those were choices I made. I live with that. With all these verdicts that I've had to go through through the years. And it's not—no matter what these cases are, they're hard on me. They're hard on everybody, I think. Hard certainly on the defendant's family. I don't like to lose this case. I consider it important that I do my job representing Mr. Eric. Apparently, I didn't do the job on the guilt phase, but we have to accept your verdict.

Now, some of you will be probably very harsh. Wanting to give a harsh sentence. Some of you may not. It's just the way you're going to look. We didn't really go into what your theories of punishment are and how you look upon things. I just submit to you this. Without taking away or blaming anybody or anything, there is evidence that this—there is undisputed evidence that Ms. Jackson pulled the pistol twice before. That's undisputed. And one of my questions was overruled, so I didn't get that answer whether she pulled a pistol on the defendant's mother. There is a conflict here. There is agitation. Like one of the jurors said—I believe it was said that in something like this there is a lot going on. You only have the tip of the iceberg probably. But I made the decision to try this case in this manner. I have to live with it.

I'm asking you for consideration on the punishment. I don't think there is any need to have Mr. Eric testify again. He already showed that—remember his testimony about the compassion he showed after how sorry he was. I don't think any more than that needs to be said. That's what he did. There was a shooting. She was shot. He's sorry. He's holding her in his hands getting 911. You heard that. It's a bad situation. It's not like he said, ha, ha, I shot you dad gum. I did it. And nobody is taking that position. He's repentant.

Now, the Judge has given—you were told a little bit about parole—let me tell you what he said is that this is a serious case. He's going to serve, no matter what, at least two years in the penitentiary before he is ever eligible for parole with this kind of case. Don't speculate that the Parole Board is going to do him any favors. He may serve day by day when [sic] you give him his sentence in the jail. He's got that daughter. He needs to get back and do something. Rehabilitate his life. I certainly will help him in any way I can if the family wants my help. I like to see a client do well, especially straighten up their lives. Personally if I achieve that I think it's— he's 36. I ask you to be towards the lower end of the scale. Remember that whatever you give him he's going to serve at least half the time before he's even eligible. He's going to the penitentiary, maybe the Derrington Unity [sic]. Maybe where that potential juror has worked as a guard. So that's what's going to happen. You don't have probation as an option.

[Trial court states that time is up.]

And ask for your consideration for the best interests of everybody. Thank you.

Despite his previous acknowledgment that he needed to show what he would have argued had the court given the defense ten minutes for closing instead of five minutes, appellant's counsel did not make a record in this regard at any time during trial, nor was he prevented from doing so. In fact, appellant's counsel suggested to the trial court that he would make such a record later, apparently by means of his motion for new trial.

Appellant sought a new trial based in part on the five-minute time limitation as to closing argument in the punishment phase. Although appellant inaccurately stated in this motion that the trial court had refused to allow him to make a bill of exceptions as to what counsel would have argued if he had been granted ten minutes for closing argument, appellant did not state in any part of the motion what this argument would have been. Similarly, at the hearing on appellant's motion for new trial, appellant's counsel asserted, inaccurately, that the trial court had refused to allow him to make a bill of exceptions as to what counsel would have argued if he had been allotted ten minutes for closing argument. Although the trial court did tell appellant's counsel to save a discussion of the background of time limitations for his appellate brief, the trial court let appellant's counsel proceed, and, instead of presenting the matters that the defense would have argued if the court had allotted ten minutes for the punishment-phase closing argument, appellant's counsel again postponed any such presentation, promising the trial court that he would present these matters in appellant's appellate brief. On appeal with different counsel, appellant still has not asserted what his trial counsel would have argued in the additional five minutes.

Appellant asserts on appeal that the trial court refused to allow him to make an informal bill of exceptions in this regard both during trial and at the motion-for-

new-trial hearing. We find no support for this assertion in the record. The record does not reflect that the trial court precluded appellant from making a record as to what his trial counsel would have argued in the additional five minutes that he requested. Though the trial court may have pressured the trial lawyers to be concise, this action is not the same as denying an opportunity to make a record. Likewise, though the trial judge said at trial that there was no need for a bill of exceptions, he allowed appellant's counsel to continue speaking. Rather than state the topics that he wanted to cover but was unable to address during closing, appellant's counsel voluntarily delayed the making of a record.

Under ordinary preservation-of-error rules, it might appear that defense counsel would be required to make a record as to all the topics he wanted to cover during closing or as to the topics that counsel could not cover because of the time limitation before jury deliberations began. *See Barajas v. State,* 732 S.W.2d 727, 729 (Tex. App.-Corpus Christi 1987, writ ref'd) (concluding appellant failed to preserve error as to trial court's twenty-minute limitation on closing argument in part because appellant did not present his bill of exceptions as to the topics he could not cover in the twenty-minute argument until after the trial was over). We have not found, and the parties have not cited, any case from the Court of Criminal Appeals directly addressing this issue.

In *Dang v. State,* appellant's counsel presented to the trial court during trial the matters that he wished to cover during closing but could not due to the time limitation, so there was no issue in *Dang* as to preservation of error. *See* 154 S.W.3d 616, 619–22 (Tex.Crim.App.2005). The Court of Criminal Appeals in *Dang* stated that courts should determine whether a trial court abused its discretion in limiting the time for closing argument by considering the following non-exclusive factors on a case-by-case basis: (1) the quantity of the evidence, (2) the duration of the trial (3) conflicts in the testimony, (4) the seriousness of the offense, (5) the complexity of the case, (6) whether counsel used the time allotted efficiently, and (7) whether counsel set out what issues were not discussed because of the time limitation. *Id.* at 621. If one of the factors for consideration on a case-by-case basis is whether counsel set out the issues not discussed because of the time limitation, then it would seem that setting out these issues might not be required. In discussing factors courts have used to determine error, including whether counsel identified the issues not discussed because of the time limitation, the *Dang* court stated that these factors were relevant to the error analysis, although some of them "may be more appropriate to considering whether a defendant has preserved the complaint for review or for determining whether the defendant was harmed." *Id.* Further, in reviewing the seventh factor, the *Dang* court used the list of topics presented at Dang's motion-for-new-trial hearing. *See id.* at 622. Presuming, without deciding, that appellant still could have timely made a record of points he wanted to cover in closing in his motion for new trial or at the motion-for-new-trial hearing, appellant did not do so. There is nothing before this court indicating what issues, if any, appellant's trial counsel wanted to address but could not because of the trial court's time limitation. On this record, we cannot determine whether the trial court reversibly erred in limiting appellant's closing argument to five minutes. *See Barajas,* 732 S.W.2d at 729. Thus, we conclude that appellant failed to preserve error as to his second issue.

Having overruled both of appellant's issues on appeal, we affirm the trial court's judgment.